*Twenty-sixth Judicial District.*
# In the Court of Common Pleas of Columbia County.

## NICHOLAS BALLIET'S CASE.

B. desirous of becoming a director and president of a bank, procured G. to pay for and have transferred to him (B.) on the books of the bank eleven shares of the stock, agreeing that as soon as he was elected director and president, the certificate of said shares was to be handed over to G., who was to become the owner thereof. B. accomplished his design, but refused to comply with the demand of G. to surrender the certificate to him according to the agreement. *Held*, That B. was not a bailee of the stock within the meaning of the 18th section of the Criminal code.

The books of the bank showing a *bona fide* ownership of the stock in B., there was an apparent compliance with the provision of the 9th section of the act of congress passed 3 June, 1864, in relation to the qualification of president and directors of national banks, while the secret arrangement between B. and G., if valid, constituted B. a mere naked trustee.

A contract made with the view of evading the provisions of a positive statute cannot be enforced, especially when the statute was enacted for the purpose of protecting the public.

**Habeas Corpus.**

Opinion delivered June 10, 1873, by

ELWELL, P. J. By the return of the sheriff, who is the jailor of Columbia county, it appears that Nicholas Balliet was committed to his custody by a warrant of commitment, issued by a justice of the peace and dated on the 22d day of May, 1873, wherein said Balliet is charged "with having become bailee of eleven shares of stock of the First National Bank of Bloomsburg, Pa., on or about the eleventh day of April, 1873, at the town of Bloomsburg, Columbia county (belonging to Levi W. Groff), and fraudulently converting the same to his own use."

This charge being somewhat of a novel character, I have listened to and considered all the facts adduced by the commonwealth in support of it. Ordinarily, no imprisonment is illegal, where the process is a justification to the officer. Com. ex. rel. Davis *v.* Leckey, 1 Watts, 67. But where a person is restrained of his liberty, on any bailable criminal charge, on showing this fact, he is entitled not only to the writ of *habeas corpus* under the act of 1785, in order that he may be admitted to bail to appear and be tried in due course, but that he may be discharged, if no sufficient cause of detention appear. Williamson *v.* Lewis, 3 Wright, 30. And in order to ascertain whether such sufficient cause exists, the facts on the part of the commonwealth may be looked into and examined. 3 Penna. L. J., 442, 2 Wall. jr , 528.

Briefly stated, the facts of this case, as established by the evidence on the part of the commonwealth, are as follows : Shortly before the 11th day of April last, an arrangement was made between the prosecutor, Levi W. Groff and Nicholas Balliet, the relator, through the agency of T. J. Miller, who was constituted the attorney in fact of Groff for that purpose, to purchase shares of stock in the First National Bank of Bloomsburg, which were to be paid for, (to the extent of eleven shares) by Groff. These eleven shares of stock were to be transferred directly from the vendor to Balliet, in order to qualify him to be elected a director and president of the bank. This transfer was to be made upon the books of the bank. It was the understanding and agreement of the parties that Groff should contract for the purchase of 240 other shares of the stock with the then president of the bank, and thereby acquire with the eleven shares, to be transferred to Balliet, a majority of the stock and control of the bank.

Balliet had no money with which to purchase any part of the stock. The money for the eleven shares, to wit : three hundred and fifty dollars for each share, was to be paid upon the checks of Groff. The purchase of the 240 shares was at the same rate, the down payment to be advanced by Groff. Balliet's note and other collaterals were to be given, but the 240 shares were to be held as security for payment of the three hundred and fifty dollars per share. When paid for by Groff and Balliet equally, they were to be partners in the ownership of the stock. But in the meantime it was specially agreed and understood, that, so soon as the purchase of the stock should be made and Balliet elected director and president of the bank, he would hand over to Groff, the certificate for the eleven shares, and thenceforth have no interest therein, but the same should be owned by Groff.

On the eleventh day of April this arrangement was carried out so far as regards the purchase of the eleven shares of stock—the transfers to Balliet—the payment of the money by Groff and the contract for the other 240 shares. On the same day the then president of the bank resigned and Nicholas Balliet was elected a director, and at the same time president of the bank. On the 14th of April he gave bonds, was sworn and

·entered upon the duties of the office. On the same day Mr. Groff, by his attorney in fact, demanded of Balliet a surrender of the certificate of the ·eleven shares of stock according to their agreement. Balliet then and at .all times after refused to comply with this demand

In the course of one week it was discovered by the directors that the interest of the stockholders required the immediate removal of Mr. Balliet from the presidency. This was done on the 21st day of April. On the 6th ·day of May Balliet sold and transferred the eleven shares of stock, and retains the money to his own use. For so doing he was .on the 22d day of May arrested upon a charge of larceny as bailee, and after hearing by the magistrate was committed to the jail of the county.

The first question presented for consideration under these facts is, whether the relator was a bailee of this stock within the meaning of the 108th section of the criminal code, which provides : "If any person being .a bailee of any property, shall fraudulently take or convert the same to his own use, or to the use of any other person, except the owner thereof, although he shall not break bulk or otherwise determine the bailment, he shall be guilty of larceny, and punished as is provided in cases of larceny of like property."

It is settled by judicial decision that the term "bailment" relates to something in the hands of the bailee which is to be returned in specie, and does not apply to the case of money in the hands of a party who is not under any obligation to return the identical coins which he originally received. Comth. *v.* Chathams, 14 Wright 187-8, and cases cited by Reed J.

The object of the law was simply to make those cases larceny where the general *property* in the thing delivered was never intended to be parted with at all, but only the *possession : ibid.* When the transaction is made to assume the form of a sale, unless it comes within the statute of false pretences, the fraudulent vendee is shielded from the charge of *taking* in the ·criminal sense, though it is otherwise in respect to the civil remedy. Carey *v.* Hotailing, 1 Hill, N. Y. Rep. 311. If, when the property or thing is delivered it is intended that the *property* shall pass, there is no larceny. 2 Bishops Cr. Law Sec. 817, note 5.

Was it intended that the title to these purchased shares of stock should pass to Balliet ? The ostensible purpose of the whole transaction was to ·obtain control of the bank, by making Balliet its president. What were the purposes beyond this, it is unnecessary now to inquire. But in passing, I cannot fail to notice the fact, that within the week of Balliet's presidency attempts were made to procure large discounts by the special .agents of Mr. Groff, and checks were drawn by them to a large amount which the vigilant cashier refused to honor and caused to be protested.

The testimony of Miller, the agent, is positive and unequivocal to the point, that the eleven shares of stock were paid for with Groff's money, and transferred to Balliet *in order to qualify him as president of the bank,*

and that this was, in advance, known to and approved by Groff. His statement in this respect is strongly corroborated by the fact that Mr. Groff, although present at the time it was made and subsequently examined as a witness, did not deny its truthfulness.

It is manifest from these facts that Groff at no time had either the legal title to, or possession of the stock. Was he at any time, even as between him and Balliet, the owner? The 9th section of the act of Congress, passed 3 June, 1864, in regard to national banks 2 Brightly's Digest 1857—65 p. 53, provides that the president of a bank shall be a director. It also provides as follows : "Each director shall own in his own right at least ten of the shares of capital stock of the association of which he is a director. Each director when appointed or elected shall take an oath, that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate or willingly permit to be violated, any of the provisions of this act, and that he is the *bona fide* owner in his own right of the number of shares required by this act, subscribed by him, or standing in his name on the books of the association, and that the same is not hypothecated or in any way pledged as a security for any loan or debt."

The plain provisions of this statute are not complied with by an ownership of stock at the moment of becoming director, but it is *continuous* so long as he shall hold the office. *"Each director shall own"* is a provision which cannot be satisfied by a mere temporary holding of an apparent ownership. Knowledge of this law is to be presumed on the part of all parties to this transaction. But presumption need not be resorted to in this case, as the proof clearly shows that an *apparent* compliance with the provisions of the law was intended. I say apparent, because the books of the bank showed a *bona fide* ownership, while the *secret* arrangement, if valid, constituted the holder a mere naked trustee.

A contract made with the view of evading the provisions of a positive statute cannot be enforced, especially when the statute was enacted for the purpose of protecting the public, as in the case of this statute relating to the national currency. The law will, in general, leave all who share in the guilt of an illegal or immoral transaction where it finds them, and will neither lend its aid to enforce the contract while executory, nor to rescind it and recover back the consideration when executed. Stewart *v.* Kennedy, 6 Watts 483 ; Visher *v.* Yates 11 John, 23. The maxim that no man who alleges his own wrong shall be heard, applies in such cases with full force ; for no right can be founded on the allegation of a wrong in which the complainant avows himself to have been a partaker. Murphy *v.* Hubert 4 Harris 50. Land or goods conveyed upon a resulting trust in fraud of creditors, cannot be recovered back by the grantor, who must submit to the loss, if the grantee choose to play false, and keep the property for his own benefit. Where all is illegal and unjust the law will not unravel the transaction, after it has been carried into execution, for the

purpose of enabling one of the parties to recover what he has advanced in pursuance of the illegal design.

In an action for the recovery of a demand connected with an illegal transaction, if the plaintiff cannot establish his claim without the aid of proof of such transaction, he cannot recover. Swan *v.* Scott, 11 S. & R. 155.

These plain principles of the law need no further elaboration. They establish beyond controversy, that, as between the prosecutor and relator, the relation of bailor and bailee did not exist at the time when the relator converted this stock to his own use, and therefore, however much we may condemn his conduct in this business, we find nothing in the case upon which to base the charge of larceny. It is therefore ordered that he be discharged from custody.

*Robert F. Clark, A. C. Smith* and *H. E. Smith* for the prosecutor; *John G. Freeze* and *Charles B. Brockway* for the relator.